## Case No. 10,377.

### NUGENT v. PUTNAM COUNTY.

[3 Biss. 105.] [1]

Circuit Court, N. D. Illinois. August, 1871.[2]

COUNTY RAILROAD AID BONDS INVALID IF IS-
SUED TO CONSOLIDATED AND NOT ORIGINAL COM-
PANY—NOT SAVED BY BEING MADE PAYABLE TO
ORIGINAL COMPANY — NOR IF CONSOLIDATED BY
CHARTER—NOR BY FALSE RECITALS.

1. County bonds issued to a consolidated rail-
road company upon a subscription by the coun-
ty to one of the roads, previous to the consolida-
tion, are illegal and invalid.

2. After the consolidation of the road to aid
which the vote was taken, the supervisors had
no authority to issue the bonds.

3. The validity of the bonds is not preserved
by making them in terms payable to the original
company. That corporation being dissolved. the
legal effect is the same as if they were drawn
payable to bearer.

4. Nor does a provision in the charter of the
company allowing them to consolidate change
the rule.

5. Though the bonds state on their face that
they are issued in pursuance of law, that asser-
tion being untrue. cannot clothe the authorities
with power to make the issue.

This was an action of assumpsit by George
Nugent on ninety coupons issued by the coun-
ty of Putnam for the interest on certain bonds
issued by said county. The defendant denied
the validity of the bonds and coupons; to
which the plaintiff replied, setting up the fol-
lowing facts by which he claimed that the
validity of the bonds was fully established,
and also that the defendant was estopped
from denying the validity of the bonds. On
and prior to the 4th of June, 1869, a corpora-
tion existed in this state under a special char-
ter known by the corporate name of the
"Kankakee & Illinois River Railroad Compa-
ny," with authority to construct and maintain
a railroad from the eastern line of this state,
by way of Momence. Kankakee, Dwight, and
Streator, to Bureau Junction. in Bureau coun-
ty, with a capital of one hundred thousand
dollars, subject to be increased to such an
amount as should be necessary to complete
the road of the company. On the 4th day of
June, 1869. the board of supervisors of the
county of Putnam, through which the pro-
posed line was to pass, ordered an election,
to be held July 10th, at the usual place for
elections in said county, to determine whether
said county should subscribe for seventy-five
thousand dollars of the stock of said compa-
ny, conditioned that said stock should be paid
for in the bonds of said county, bearing in-
terest at ten per cent. per annum, payable
annually, provided said road should be locat-
ed and constructed through or within one-half
mile of the corporate limits of the town of
Hennepin, in said county. The election was
held. resulting in favor of said subscription;
and on the 4th of January, 1870, another

1 [Reported by Josiah H. Bissell, Esq., and
here reprinted by permission.]

2 [Reversed in 19 Wall. (86 U. S.) 241.]

election was called by said board, to be held
on the 8th of February, 1870, to determine
whether said county would subscribe for
twenty-five thousand dollars additional stock
of said railroad company, payable in the
bonds of said county, on the condition that
said railroad should be located within one-
half mile of the corporate limits of the town
of Hennepin, these bonds to bear interest at
ten per cent. per annum. This election was
held, and resulted in favor of said proposi-
tion. After said election, on the 10th day of
July, 1870. the said board of supervisors
adopted a resolution stating that said sub-
scription of seventy-five thousand dollars "is
hereby made in pursuance of said election,
subject to the following conditions: That a
committee of five persons be hereafter ap-
pointed by this board, whose duty it shall be
to direct the issue of said bonds and protect
the interests of said county, and discharge
such other duty as shall be devolved upon
them by said board, and the bonds of said
county shall be issued on said subscription
in sums of not less than five hundred dollars,
payable in annual installments of not less
than ten thousand dollars. five years after the
date of issue, bearing interest at the rate of
ten per cent. per annum, payable annually,
and that the clerk of the county court should
issue to said railroad company the said bonds,
but providing that the bonds should not be
issued until a bona fide contract was made
with responsible parties for all the iron nec-
essary to the construction of the road, and
that said bonds issued to said company upon
the orders of said board shall be applied to
the construction of said railroad in and
through said county of Putnam, as specified
in a previous order of this board." On the
15th of March, 1870, said board passed a res-
olution resolving that said subscription of
twenty-five thousand dollars is hereby made
in pursuance of said resolution of the 8th of
February. subject to the following conditions,
(being substantially the same as were at-
tached to the seventy-five thousand dollar is-
sue.) But no subscription was in fact ever
made to the stock of said company by or on
behalf of said county. On and prior to the
21st of October, 1870, there existed in the
state of Indiana a corporation known as the
"Plymouth, Kankakee & Pacific Railroad
Company," with power to construct and
maintain a railroad from the easterly line of
this state to Plymouth, Indiana. On the 21st
of October, 1870, the corporate rights, stock,
powers and franchises of the Kankakee &
Illinois River Railroad Company were consol-
idated with the stock, corporate rights and
franchises of the Plymouth, Kankakee & Pa-
cific Railroad Company, and they became a
consolidated company known as the Plym-
outh, Kankakee & Pacific Railroad Company,
with a capital stock of two millions five hun-
dred thousand dollars. it being provided by
the articles of consolidation that the stock-
holders of the original companies should be

stockholders of the consolidated company. To this consolidation the supervisors of the county of Putnam assented, and issued to said consolidated company the bonds of the county for said stock so voted to said Kankakee & Illinois Railroad Company, bearing interest and payable as provided in said resolution, with coupons attached for annual interest accruing thereon, which are the coupons in controversy, said bonds being made payable in terms to the Kankakee & Illinois River Railroad Company, but actually dated, issued and delivered after said Kankakee & Illinois River Railroad Company had become consolidated with the Plymouth, Kankakee & Pacific Railroad Company, and after the election which sanctioned the subscription to the stock of said Kankakee & Illinois River Railroad Company. The board of supervisors appointed a committee who delivered the bonds to said railroad, and said committee, before issuing the bonds, certified to said board of supervisors that said railroad company had in all respects performed all the conditions required of it, and was entitled to receive said bonds. In the fall of 1871 said board of supervisors levied a tax on all the taxable property of said county to raise the money for paying the interest on said bonds, and also borrowed the money to pay a portion of the interest which had accrued thereon. The plaintiff was a holder of said bonds for value. The said bonds state upon their face that they were "issued for the subscription to the stock of the Kankakee & Illinois River Railroad Company, in pursuance of a resolution of the board of supervisors of said county." Demurrer by defendant to replication.

T. M. Shaw, for plaintiff.
T. Lyle Dickey, for defendant.

BLODGETT, District Judge. Upon these facts the question arises as to the liability of the county of Putnam upon the bonds and coupons in question; or, to more specifically state the issue as made by the pleadings, "Is the county, by what it has done, estopped from denying its liability upon these bonds and coupons?" I have very carefully examined the question thus raised by these pleadings, and feel compelled to say that I cannot find any line of distinction between this case and Marsh v. Fulton Co., 10 Wall. [77 U. S.] 676, and it seems to me that case must control the decision of the court in this.

The material facts in that case are these: The state had chartered the Mississippi & Wabash Railroad Company, with power to construct a railroad across the state through Fulton county. In November, 1853, the question was submitted to the voters of the county whether the county should subscribe seventy-five thousand dollars to the stock of said company, payable in bonds of said county, such bonds not to be issued until the secretary of the company should certify to the board that seven hundred thousand dollars had been subscribed and that five per cent. had been paid thereon. A majority of the votes of the county were cast in favor of the subscription, and in April, 1854, the board ordered its clerk to subscribe for seventy-five thousand dollars of the stock, and issue bonds when it should be certified to him by the secretary of the company that seven hundred thousand dollars of the stock had been subscribed and five per cent. had been paid thereon. In February, 1857, an act was passed by the legislature of Illinois amending the charter of the Mississippi & Wabash Railroad, by which the line of the road was divided into three divisions, and each division was placed under the management and control of a board of three commissioners, to be elected by the stockholders of each division, to be invested with all the powers of the directors of the road in their division. [Private Laws 1857, p. 1053.] In April, 1857, the stockholders of the central division elected commissioners of that division, who thenceforth, until December, 1868, exercised all the powers conferred by this act.

On the books of the central division thus organized, the clerk of the county court of Fulton county—said county being in said division—acting as the clerk of the board of supervisors, made a subscription of seventy-five thousand dollars in the name of the county. In September following he issued to this division the bonds which were in suit in that cause. On these facts the court says:

"The amendatory act of 1857, dividing the road into three divisions, and subjecting each division to the control and management of a different board, clothed with all the powers of the original board, so far as the division was concerned, worked a fundamental change in the character of the original corporation, and created three distinct corporations in its place. A subscription to a company whose charter provided for a continuous line of railroad of two hundred and thirty miles, across the entire state, was voted by the electors of Fulton county; not a subscription to a company whose line of road was less than sixty miles in extent, and which, disconnected from the other portions of the original line, would be of comparatively little value.

"But it is earnestly contended that the plaintiff was an innocent purchaser of the bonds without notice of their invalidity. If such were the fact, we do not perceive how it could affect the liability of the county of Fulton. This is not a case where the party executing the instruments possessed a general capacity to contract, and where the instrument might for such reason be taken without special inquiry into their validity. It is a case where the power to contract never existed; where the instruments might, with equal authority, have been issued by any other citizen of the county. It is a case, too, where the holder was bound to look to

the action of the officers of the county, and ascertain whether the law had been so far followed by them as to justify the issue of the bonds. The authority to contract must exist before any protection as an innocent purchaser can be claimed by the holder.

"It is also contended that if the bonds in suit were issued without authority, their issue was subsequently ratified, and various acts of the supervisors of the county are cited in support of the supposed ratification. These acts fall very far short of showing any attempted ratification even by the supervisors. But the answer to them all is, that the power of ratification did not lie with the supervisors. A ratification is, in its effect upon the act of an agent, equivalent to the possession by him of a previous authority. It operates upon the act ratified in the same manner as though the authority of the agent to do the act existed originally. It follows that a ratification can only be made when the party ratifying possesses the power to perform the act ratified."

"The supervisors possessed no authority to make the subscription or issue the bonds in the first instance, without the previous sanction of the qualified voters of the county. The supervisors, in that particular, were the mere agents of the county. They could not, therefore, ratify a subscription without a vote of the county, because they could not make a subscription, in the first instance, without such authorization. It would be absurd to say that they could, without such vote, by simple expressions of approval or in some other indirect way, give validity to acts, when they were directly in terms prohibited by statute from doing those acts, until after such vote was had. That would be equivalent to saying that an agent, not having the power to do a particular act for his principal, could give validity to such act by its indirect recognition."

I have quoted these copious extracts from this decision because it seems to me to contain the controlling principle of the case at bar. The votes of the 10th of July, 1869, and the 8th of February, 1870, were both upon the proposition to subscribe to the capital stock of the Kankakee & Illinois River Railroad Company, a corporation possessing the power to construct and maintain a line of road between certain termini in this state, with a capital stock limited in any event to the cost of constructing the road.

The bonds in question were issued after this Kankakee & Illinois River Railroad Company had merged itself by articles of consolidation into another corporation now known as the Plymouth, Kankakee & Pacific Railroad Company, a corporation having control of a different enterprise from that of the original company, possessing a different capital stock, and governed by a different board of directors, elected upon a different basis, with different termini to the road.

In the case of Clearwater v. Meredith, 1 Wall. [68 U. S.] 25, the supreme court of the United States has passed upon the effect of consolidating railroad corporations. In this case Meredith had guaranteed to Clearwater that certain railroad stock should be worth par on the 1st of October, 1855; suit was brought upon the guarantee, and assigned for breach that the stock was not worth par at the time stipulated. To this the defendant pleaded that the stock of the said company had been merged and consolidated with the stock of another railroad company, making one stock of the two under a new corporate name, and that the consolidation was made with the consent of the stockholders of both companies. Upon these facts the supreme court, by Mr. Justice Davis, says: "When any person takes stock in a railroad corporation he has entered into a contract with the company that his interests shall be subject to the direction and control of the proper authorities of the corporation, to accomplish the object for which the company was organized. He does not agree that the improvement to which he subscribed should be changed in its purposes and character, at the will and pleasure of a majority of the stockholders, so that new responsibilities, and it may be, new hazards are added to the original undertaking. He may be very willing to embark in one enterprise and unwilling to engage in another; to assist in building a short line railway and adverse to risking his money in one having a longer line of transit. But it is not every unimportant change which would work a dissolution of the contract. It must be such a change that a new and different business is superadded to the original undertaking.

"The act of the legislature of Indiana, allowing corporations to merge and consolidate their stock, was an enabling act—was permissive, not mandatory. It simply gave the consent of the legislature to whatever could lawfully be done, and which, without that consent, could not be done at all. By virtue of this act, the consolidations in the plea stated were made. Clearwater, before the consolidation, was a stockholder in one corporation, created for a given purpose; after it he was a stockholder in another and different corporation, with other privileges, powers, franchises, and stockholders. The effect of the consolidation 'was a dissolution of the three corporations, and at the same instant, the creation of a new corporation, with property, liabilities, and stockholders, derived from those passing out of existence.' McMahan v. Morrison, 16 Ind. 172. And the act of consolidation was not void, because the state assented to it; but a non-consenting stockholder was discharged."

It is not necessary to quote more than this, for the principle which I alluded to is clearly announced, namely, that a different corporation results from the consolidation. The consolidated company is not either of the original corporations, although it may take the name of one of them. The original corpo-

ration for the stock of which the county of Putnam subscribed, was solely under the control of the state of Illinois; its franchises had been created by that state, and were under its control. The consolidated company is in two states; its affairs are subject to the control of the legislatures of two states.

The same principle was announced in the case of McMahan v. Morrison, in the 16th of Indiana, and has also been fully set forth in 29 Ill. 242. Now, the principle of all these authorities which I have quoted, it seems to me, is that the corporate existence of the Kankakee & Illinois River Railroad Company ceased on the 21st of October, 1871, and from that time forward whatever franchises it had were merged in the Plymouth, Kankakee & Pacific Railroad Company, the consolidated corporation, and after this event had taken place, after what we may call the legal demise of the Kankakee & Illinois River Railroad Company, the board of supervisors of Putnam county authorized the issue to the consolidated corporation of the bonds in question.

I cannot see any feature in this case which differs from Marsh v. Fulton Co. [supra], unless that this is a stronger case than that. There the corporation existed in and was controlled by this state alone, and its termini remained the same, while this consolidated corporation is a very different enterprise from the original to which the subscription was authorized.

It was insisted in the argument, and also in the pleadings, that the fact that these bonds were made payable in terms to the Kankakee & Illinois River Railroad Company should control the decision of the court. It certainly is an important fact, and has received consideration, but I cannot see that it changes the legal bearings of the question. This was a defunct corporation, and the bonds might just as well have been made payable to bearer, and the person to whom they are made payable cuts no figure in the case.

The Kankakee & Illinois River Railroad Company had gone out of existence, and its demise had become a matter of public notoriety—a matter of public record, because it was necessary that the articles of consolidation should be filed in the office of the secretary of state.

It is urged further that this company having the power originally by its charter to consolidate with another company, makes the rule in Clearwater v. Meredith inapplicable in this case; but I cannot look upon this clause as changing the application, because since February, 1854, (Act Feb. 28, 1854, Gross' St. 1872, p. 537) there has been upon the statute books of this state a general law authorizing any two railroad corporations whose lines form a continuous route, to consolidate their stock, franchises and property into one corporation, and in examining the proceedings by which this con-

solidation was accomplished, it is clear that this consolidation was made under this general law, and not under the charter of the company.

Now, in the case of Clearwater v. Meredith, the general law of the state of Indiana existed at the time the stock in question was issued. The law of that state and of Illinois is substantially the same, the two states having kept pace with each other in their legislation on this question; but the supreme court did not hold that the organic right of either or both corporations to consolidate changed the rights of the stockholders.

Following the doctrine laid down in Marsh v. Fulton Co. I am of opinion these bonds are illegal and void. They were issued by the board of supervisors without the power being granted to them for that purpose. The vote of the people authorized the county to issue its bonds to the Kankakee & Illinois River Railroad Company, and they were in fact issued to another company without a vote. It is true that they bear on their face the statement that they were issued in pursuance of law, and for the stock of the Kankakee & Illinois River Railroad Company, but the assertion is untrue and cannot be held to clothe the county authorities with power to make the issue. Demurrer sustained.

[In error to the supreme court the judgment of this court was reversed. 19 Wall. (86 U. S.) 241.]

NOTE. For a full discussion of various questions arising under municipal bonds, consult the following cases previously reported in this series, and numerous authorities there cited: Mygatt v. Green Bay [Case No. 9,998]; Luling v. Racine [Id. 8,603]; Schenck v. Marshall Co. [Id. 12,449]; Goedgen v. Manitowoc Co. [Id. 5,501.] The duty of boards of supervisors to follow strictly the law, and their powers construed, Harding v. Rockford, R. I. & St. L. R. Co. [65 Ill. 90] (supreme court of Illinois, May, 1873.)